## Kern's Petition.

*Guardian and ward—Misconduct of guardian—Removal—Parties—Act of June 7, 1917, P. L. 447.*

1. Members of a fraternal and philanthropic society may petition for the removal of a guardian who has misconducted himself.

2. A guardian of a girl fifteen years old will be removed where he has compelled his ward to do work on his farm not fitting her age or sex, has kept her from school to do his own work, and has not permitted her to associate with other young people of her own age and condition.

Petition of Mary Elizabeth Kern, by her next friends, for the removal of her guardian.  O. C. Snyder Co.

*Jay G. Weiser*, for petitioners;  *A. F. Gilbert*, for respondent.

POTTER, P. J., July 29, 1927.—This is a proceeding for the removal of a guardian of a minor, the petitioners alleging, *inter alia*, that the guardian has not properly discharged his trust with relation to the mental and moral culture of his ward, in that she is obliged to do work unsuitable for her to do, that her education has been neglected, and that her labors are oppressive and burdensome.

This ward is now about seventeen years of age, having been born on June 7, 1909. Her parents have been dead for a number of years. Robert F. Kern, her uncle by blood, having been her father's brother, was appointed as her guardian some eleven years ago and has continued as such up to the present time, during which time she has been a resident in his home and family.

These proceedings were instituted by Charles R. Spaid, M. H. Bingaman and Charles E. Freed, who reside in Beavertown, Snyder County, just outside of which this ward resides with her said guardian, the petitioners being members of the Patriotic Order of the Sons of America, of Beavertown, a fraternal organization having for one of its objects philanthropic principles generally and especially the education of the coming generation.

It is contended by the respected counsel for the respondent that because these three petitioners are not relatives of this ward, they have no standing to institute these proceedings.  The Fiduciaries Act of June 7, 1917, § 53 *(b)*, P. L. 519, provides that, "whenever it shall be made to appear to the Orphans' Court having jurisdiction of the accounts of any fiduciary, on the oath or affirmation of *any person interested*, that there exists any one or more of the grounds for removal of such fiduciary enumerated in the last preceding clause of this section, such court may issue a citation," etc.  Subdivision 5 of clause *(a)* of section 53 of the same act provides for the removal of a guardian "when any guardian, whether testamentary or otherwise, mismanages the minor's estate, or misconducts himself in respect to the maintenance, education or moral interests of the minor."

### Kern's Petition.

It is to be noted that this act permits the petition to be made by *any party interested.* In Green's Estate, 7 Phila. 502, it is held that any relative or friend may intervene as *amicus curiæ*, and the court will always protect trustees and fiduciaries from harassing citations. If no one but a relative of the ward was permitted to protect her interests, we could well have the pitiable spectacle of a ward with no relatives in the custody of an unscrupulous guardian gradually and quietly appropriating her moneys to himself, placing upon her arduous and burdensome tasks for which she is not fitted, neglecting her mental training, excluding her from association with other young people, and otherwise rendering her condition just the opposite of what the exuberance of youth needs for development into ripe manhood or womanhood. It is needless to further discuss this question. We are of the opinion that the three petitioners in this case, or any one of them, have full legal standing to petition for the citation, and,. in passing, we might also say that when non-relatives, persons who have no interest in the ward by either affinity or by consanguinity, intervene and bring the matter to our attention, it indeed seems to be high time that we look into this ward's affairs very carefully.

It has been testified by various witnesses in substance as follows: That this girl attended Sunday school about twice a month; that she attended the class meeting of her Sunday school class, held at the residences of the members once a month, once in two years and three months; that she was not allowed to go to the annual class picnic of her Sunday school class; that, at the age of fifteen years, she had to get up early each morning and milk the cows; that she cleaned the manure out of the stables, her guardian being a farmer; that she carried pieces of cord-wood out of the woods when snow was on the ground; that she forked hay on the wagon in the field; that she wheeled the wheelbarrow loaded with two cans of milk; that her work was mostly about the cows and the barn; that on an extremely hot day she was in the field pulling thistles out of the wheat and oats; that she cleaned out the pig-pen, and especially on a Sunday evening between 7 and 8 o'clock; that she washed the automobile in cold winter weather; that she helped to unload corn-fodder; that she turned the wind-mill by hand; that she wheeled two bags of potatoes on a wheelbarrow; that she watched the cows in a field of high grass and was wet up to her waist; that her guardian asked her school teacher to sign a certificate that she had finished the sixth grade in public school for the purpose of getting her out of school to help him with farm work when in fact she was only in the fifth grade, which was refused by the teacher; that she was irregular in her attendance at school and was often late; that the guardian wanted to keep her out of school to help him husk corn.

Some of these allegations are denied by the guardian and some are admitted by him, and, strange to say, this ward said in open court that she liked it with her present guardian, wanted him retained and wanted to remain with him. But, taking into consideration the demeanor of the parties in court, as well as other matters brought to our attention in these proceedings, we are led to firmly believe she said this because she was told to say it. We can in no manner regard the work this girl did in and about the premises of her guardian as in any manner belonging to a woman, and especially to a young girl just passing through a critical period of her life. Many years ago, we find the women to have been the carriers of water and the hewers of stone among barbaric nations and tribes, but in this enlightened age we are glad to say that womankind has found her true sphere as the weaker sex physically, and people in these days do not approve of women performing the labors cast

upon this young girl. She should have been sent to school every day, and no one should connive or design to keep her out of it. It has been said she was somewhat backward in her studies, which we regard as a stronger reason why she should have been kept in school continually in an endeavor to make up by close application what nature had withheld from her in the way of ability.

It may be that this guardian is, in his way, an upright and conscientious man, but he seems to have entirely misunderstood his duty as a guardian. If he obliged this girl to perform these enumerated tasks, then he is to be all the more severely censured. If she did them of her own free will, he should know they were too heavy and arduous for her and not work for a woman, and should have forbidden and prevented her from doing them. Taking either view of this matter, we think he was derelict in the performance of his duty as guardian, putting it in mild language. It matters little to an orphan child whether her interests are sacrificed and her prospects blighted by well-meaning ignorance or by wilful malice. Either is within the definition of misconduct, a word which applies not to the motive, but to the act: Nicholson's Appeal, 20 Pa. 50.

In our judgment, this young girl should not have been permitted to perform the labors she did, and surely should not have been asked or commanded to do them. Nothing but ill health should have kept her out of school. She should have been permitted to associate with young people of her age. She should have been encouraged to attend church, Sunday school, the meetings and picnics of her Sunday school class and the like. In fact, everything should have been done that would round her into a useful member of society and fit her for the all-important stages in her life of marriage and motherhood. While, on the contrary, she has lived almost the life of a recluse and has had her guardian or his wife with her almost wherever she went. It is well and proper for the older ones to keep a watchful eye on the demeanor and conduct of the younger ones, but it is folly to say that a young person in her teens can find enjoyment constantly in the company of persons twenty to twenty-five years her senior. Like begets like, and wants it. Young people want the society of young people, while older ones want the society of people more of their age.

The second triennial account of this guardian was offered in evidence, which was objected to by the respondent because no reference was made to it in the petition or complaint. We admitted it because, since we are inquiring into the affairs of this guardian, we may as well look into all of them and thus prevent other subsequent litigation. While we are washing soiled linen, we may as well wash all of it. This girl is a ward of the court. She is under our care and protection and guidance, and the guardian is an officer of the court to care for her, protect her and guide her. She is so much under our care and protection that, even in the selection of a guardian, should she elect a person in our judgment not a proper one, we can refuse to appoint him and make an appointment of our own. Her selection is not conclusive or final. And should we know of any misconduct on his part, we can call him into court to account without any petition or complaint. And if we have any well-grounded suspicion of any mismanagement by him of his ward's estate, it is our duty to take cognizance of it of our own volition. We can call upon him to file an account any time we deem it proper. And, to this end, we have admitted this account offered into the evidence of this proceeding, and we have even gone farther than this by calling for and examining his first triennial account. He tells us that he charged the girl no boarding, but he

should not either. In case of the employment of a domestic in the household, she is paid a weekly sum and gets her boarding. In case of the employment of a farm hand, he gets a certain sum per month and his boarding. So that we are inclined to think this guardian was getting cheap labor out of his ward.

His first account shows moneys in his hands of $2564.47. All he has to pay out of these moneys is for clothing and incidentals for his ward, and still we find this sum shrinking down to the sum of $1794.91 when the second account is filed, or a shrinkage of approximately $800. This surely must be properly explained. Then, in his first account, we find that on every item of credit, money of hers he spent for her, he claims interest on each item, which he claims as belonging to him and retains. Why is this, and how can this be correct? This also needs our attention. Or he is paying for merchandise for her with her money, perhaps legitimate items of expenditure, but puts in his own pocket the interest which comes from her money on the amount expended. We fail to see how any interest can be charged on any of these items. Then, again, we find many items paid to his wife for the ward, sometimes stating what they are for and sometimes not. Why was this money paid to the wife instead of to the merchant from whom the articles are supposed to have been bought? And many of these items are lumped sums, for what? We are entitled to a more specific and itemized explanation regarding them than is thus given. And we find so many items paid to the daughters of this guardian, concerning which we are entitled to full explanation. In fact, we think these two triennial accounts filed, one on Nov. 30, 1923, and the other on Jan. 6, 1927, contain many items that must be more fully explained. As they now stand, a surcharge is imminent. Perhaps they can be fully explained. At least, we hope so.

We think we have covered the questions before us. After hearing the testimony in open court, noting the demeanor of the witnesses upon the stand and after going over the whole case at more leisure with careful and thoughtful deliberation, we are firmly convinced that this guardian has fallen far short of his official duty towards his ward from both a moral and a financial viewpoint. If his official misconduct arises from an ignorant conception of his duties, his failure towards his ward has worked irreparable loss to her. Time has gone by which will never come back to her. If his failure has been knowingly and wilful, then he is to be all the more censured.

In either event, we think he should surrender up his full guardianship, this embracing the custody of the ward as well as all her property.

And now, to wit, July 29, 1927, the citation is made absolute, and Robert F. Kern, as guardian of Mary Elizabeth Kern, is removed from his guardianship, which removal is to date from this date, and Mr. Jay J. Washam, of No. 111 North Broad Street, Jersey Shore, Penna., whose wife was a sister of the deceased mother of this ward, is hereby appointed as guardian in his stead, he to file a bond in the sum of $4000, with security to be approved by this court, immediately, and to remove his said ward into his home and family at his earliest convenience. The former guardian, Robert F. Kern, to pay over to the new guardian from the moneys of his former ward in his hands, within thirty days from this date, the sum of $1000, and to file a full, final and detailed account of his management of his former ward's estate from the time he received her property into his hands up to the present time to the next term of this court, after which full and final settlement will be made with the new guardian.

From Charles P. Ulrich, Selinsgrove, Pa.